519 A.2d 727

**SOUTHERN MARYLAND HOSPITAL CENTER, INC. et al.**

v.

**FORT WASHINGTON COMMUNITY HOSPITAL, INC. et al.**

No. 56, Sept. Term, 1986.

Court of Appeals of Maryland.

Jan. 12, 1987.

Daniel J. O'Brien, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Jennifer Robbins, Asst. Atty. Gen., on the brief), Baltimore, for State of Md., Maryland Health Resources Planning Com'n.

Gary R. Alexander (Alexander & Cleaver, on the brief), Fort Washington, for Southern Maryland Hosp. Center, Inc.

Robert V. Barton, Jr. (Ober, Kaler, Grimes & Shriver, on the brief), Baltimore, for Greater Southeast Community Hosp. Corp.

Arvin W. Rosen (William L. Siskind and Siskind, Burch Grady & Rosen, on the brief), Baltimore, for AMI Doctors' Hosp. of Prince George's County.

Ellis J. Koch and O'Malley, Miles, McCarthy & Harrell, on the brief, Upper Marlboro, for Fort Washington Community Hosp., Inc.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ., and MARVIN H. SMITH, Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

MURPHY, Chief Judge.

The Maryland Health Resources Planning Commission (Commission) granted a certificate of need to Southern Maryland Hospital Center (Southern) to add thirty-seven medical/surgical beds to its existing 308–bed hospital. The

certificate contained four "conditions" that required the hospital to submit additional information to the Commission. We must decide whether the Commission exceeded its authority in this case by granting a certificate of need subject to the stated conditions.

## I.

### A. *Regulatory Framework*

The National Health Planning and Development Act of 1974 (Federal Act), as amended, 42 U.S.C. §§ 300k—300n (1982), required the states to establish a health planning system as a prerequisite to receiving federal funds. *See* 42 U.S.C. § 300m.[1] Under the Federal Act, a state had to designate a state agency to conduct the state's health planning activities, prepare state health plans, and administer a certificate of need program. 42 U.S.C. § 300m-2(a). The Federal Act also specified minimum procedures and review criteria to be used by the state agency in conducting certificate of need programs. 42 U.S.C. § 300n-1.

By ch. 383 of the Acts of 1975, the Maryland General Assembly authorized the Governor to implement the provisions of the Federal Act. Subsequent legislation created the Maryland Health Planning and Development Agency and the Maryland Health Resources Planning Commission to administer the federal and state health planning legislation. *See* ch. 911 of the Acts of 1978; ch. 108 of the Acts of

---

1. The authorization for federal grants to state health planning agencies expired September 30, 1982. *See* 42 U.S.C. § 300n-6. In fiscal years 1983, 1984, 1985, and 1986, Congress continued funding for state health planning activities despite lack of authorization. Pub.L. 99-178, 99 Stat. 1102, 1108 (1985); Pub.L. 98-473, 98 Stat. 1837, 1963 (1984); Pub.L. 98-151, 97 Stat. 964, 972 (1983); Pub.L. 97-377, tit. V, § 512(2), 96 Stat. 1830, 1905-06 (1982). Despite the continued funding, Congress removed penalties for a state's noncompliance with the federal act. Pub.L. 97-377, *supra.* On October 3, 1986, Congress refused to continue funding without reauthorization. *See* H.J.Res. 738, Amendment 3194, 99th Cong., 2d Sess., 132 Cong.Rec. S14876-79 (daily ed. Oct. 3, 1986). Thus, Maryland no longer receives federal funds for its health planning activities.

1982. Sections 19–101 to –123 of the Maryland Code (Cum. Supp.1986) Health-General Article now govern health planning activities in Maryland.[2] Section 19–102(c) recognizes the Federal Act and any amendments not requiring state legislation to be effective; § 19–107(a)(1) authorizes the Commission to adopt rules and regulations; § 19–114 requires the adoption of a state health plan, and §§ 19–115 to –118 govern the certificate of need program. The regulations governing the certificate of need program appear at COMAR 10.24.01. For a discussion of Maryland's health planning law, see *Sinai Hosp. v. Md. Health Resources Com'n*, 306 Md. 472, 509 A.2d 1202 (1986).

Section 19–118(j) authorizes the Commission to assume responsibility for certificate of need decisions on January 1, 1983. New regulations governing such decisions did not take effect until March 18, 1983; thus, applications docketed for review before that date were considered under COMAR 10.24.01 (1980). Because § 19–118(f) allowed evidentiary hearings while the predecessor statute did not, the new regulations taking effect March 18, 1983 governed those hearings.[3]

The regulations applicable to the Commission's review of Southern's proposed project required that it consider thirteen factors in determining whether to issue a certificate of need (CON). COMAR 10.24.01.06B(2)(a)–(m) (1980). These factors included the relationship of the project to the applicable health systems plan, state health plan, the applicant's long-range plan, the need for and financial feasibility of the project, the availability of resources to fund and staff the project, and the existence of less costly or more effective alternatives to the proposed project.

---

**2.** All subsequent citations to the Maryland Code are to the Health-General Article unless otherwise noted.

**3.** When discussing the regulations applicable to the review of Southern's application, we will include the date to indicate that these regulations are no longer in effect. If no date appears, then the COMAR citation is to the current regulations.

COMAR 10.24.01.07C–E govern evidentiary hearings requested pursuant to § 19–118(f). The Commission must publish notice of an evidentiary hearing in a newspaper of general circulation in the appropriate health service area. COMAR 10.24.01.07C(3). At a prehearing conference, interested persons who wish to participate in the hearing will be identified. COMAR 10.24.01.07D(2)(a). Finally, COMAR 10.24.01.07E contains the procedures governing the hearing itself. Participants in the hearing may present oral or written testimony and may cross-examine witnesses. COMAR 10.24.01.07E(10).

### B. *Factual Background*

Southern, a 308–bed hospital in southern Prince George's County, submitted an application on March 11, 1983 for a certificate of need (CON) to add 120 medical/surgical beds, to relocate and expand its ambulatory surgery program, and to consolidate and expand its critical care services. Southern estimated that the project would cost $14.9 million, including financing costs. The Commission docketed the application for review on March 17, 1983, and Southern requested an evidentiary hearing on May 4, 1983.

The Southern Maryland Health Systems Agency (SMHSA), the regional health planning agency for Prince George's County, reviewed the project for compliance with the Southern Maryland Health Systems Plan (SMHSP) and recommended withdrawal of the project until SMHSA completed its analysis of the need for and recommended location of any additional medical/surgical beds in Prince George's County.

The Commission staff reviewed the project for compliance with the SMHSP and the State Health Plan and recommended disapproval. The staff concluded that Southern had not demonstrated need for its proposal or consistency with the guidelines and standards in the applicable plans. Staff modified its findings in some respects after the first two days of the evidentiary hearing, but did not change its recommendation that the CON be denied. The modification

did note that the SMHSP now showed a need for thirty-seven additional medical/surgical beds in southern Prince George's County.

The Commission designated one of its members to preside at the evidentiary hearing held on November 18 and 21 and December 8 and 9, 1983. In accordance with Commission regulations, notice of this hearing was published in newspapers of general circulation in the health services area. The appellees, Greater Southeast Community Hospital, Fort Washington Community Hospital, and Doctors' Hospital of Prince George's County, did not receive personal notice of or participate in the hearing.

At the hearing, Southern presented extensive testimony in support of its application. Although it responded to the hearing officer's questions about the feasibility of a thirty-seven bed addition and presented some cost and construction information, it emphasized that this testimony should not be construed as a modification of its request for 120 additional beds.

The hearing officer recommended approval of Southern's project subject to the following conditions:

"1. Within 180 days of the date of issuance of the Certificate of Need, the applicant shall amend the number of beds proposed to reflect the addition of 37 medical/surgical beds and the deletion of an ambulatory surgical program. Simultaneously, a revised statement indicating revenues, expenses, costs, charges, and capital costs (including source of any loans at the proposed or lower interest rate contained in the application) at the level of 37 additional medical/surgical beds, a revised statement indicating manpower needs at the level of 37 additional medical/surgical beds, and a revised architectural plan for the 37 additional medical surgical bed addition must be submitted to the Commission for its review.

"2. Within 60 days from the date of this Certification, [Southern] must revise its policy regarding ability to pay so that it meets the requirements of SHP accessibility standard 1A–3; and must, where appropriate, submit written transfer agreements required by SHP continuity standard 1A–6.

"3. Within 60 days from the date of this Certification, [Southern] must document that the current placement of its critical care units constitutes the lowest-cost configuration feasible or provide a proposal for meeting HSP cost standard 5d.

"4. If it decides to establish a definitive observation unit, [Southern] must supply within 60 days data demonstrating that the higher rate applicable to this unit will not invalidate the overall cost savings claimed to result from shortened lengths of stay in critical care beds, and reduced average medical/surgical rates; and must explore the feasibility and desirability of separate licensure of such a unit and report the results to the Commission."

The appellees filed exceptions to this recommendation and participated in an exceptions hearing before the full Commission. On February 14, 1984, the Commission adopted the hearing officer's recommendation and granted Southern a CON subject to the listed conditions. The appellees filed timely appeals, and the Circuit Court for Prince George's County affirmed the Commission. The Court of Special Appeals, in an extensive opinion written for the court by Judge Menchine, reversed the Commission's grant of a CON to Southern and remanded for further proceedings. *Ft. Wash. Community Hosp. v. S. Md. Hosp.*, 66 Md.App. 480, 505 A.2d 117 (1986). We subsequently granted certiorari to consider the issues of public importance presented in the case.

In its opinion, the intermediate appellate court first determined that the Maryland health planning law, Maryland Code (Cum.Supp.1986) §§ 19–101 to –123 of the Health-General Article, required compliance with both Maryland and

federal law. According to the court, the CON granted to Southern violated provisions of both the federal health planning law, 42 U.S.C. §§ 300k—300n (1982) and the Commission's regulations, COMAR 10.24.01 (1980). Specifically, it said that the CON did not include the costs associated with the project or the financing terms as required by COMAR 10.24.01.06K. *Ft. Wash., supra,* 66 Md.App. at 496–98, 505 A.2d 117.

In addition, the court determined that the hearing officer's report was not complete, as required by § 19–118(d)(4) of the Health-General Article. It also noted that the additional information required by the conditions related to six criteria that the statute directed the Commission to consider *before* issuing a CON. *Ft. Wash., supra,* 66 Md.App. at 498–505, 505 A.2d 117.

The Court of Special Appeals also rejected the Commission's argument that its power to approve a project with conditions, pursuant to § 19–118(d)(4), authorized the conditions attached to Southern's CON. The court interpreted the term "condition" in § 19–118(d)(4) to mean "a specific requirement or restriction within the unilateral capacity of the applicant to achieve or to prevent." 66 Md.App. at 505, 505 A.2d 117. The court noted that Southern might not be able to satisfy these conditions. Because this information was indispensable to a determination of need for the project, it found that the Commission could not issue a valid CON subject to the listed conditions. *Id.* at 505–06, 505 A.2d 117.

## II.

### A. *Applicability of Federal Law*

■ The Commission and Southern first protest the intermediate appellate court's conclusion that the Commission must comply with federal law. In our view, they overstate the significance of this conclusion to both the decision in this case and future health planning initiatives.

First, as the Commission noted in oral argument, Congress failed to reauthorize the federal health planning act and declined to continue appropriations without an authorization bill. *See supra* footnote 1. Thus, the opinion below would have no effect on future decisions. As the Federal Act has expired, the Commission obviously need not comply with it.

Second, and more important, the Court of Special Appeals did not rely exclusively on the violation of federal requirements in reversing the Commission's decision. The state regulations applicable to Southern's proposal contain requirements virtually identical to those imposed by the Federal Act, and the court consistently cited both the federal and state provisions in its opinion. *Ft. Wash., supra,* 66 Md.App. at 499, 505 A.2d 117.

Third, as the Court of Special Appeals noted, Maryland law expressly recognizes the federal health planning law. § 19–102(c). The preface to the regulations applicable to a CON review states that the regulations provide for a CON program in conformance with federal law. COMAR 10.24.-01 Preface (1980). Thus, we are not faced with an amendment to state law inconsistent with the federal statute as in *Harrisburg Hospital v. Thornburgh,* 616 F.Supp. 699 (M.D. Pa.1985). Nor does this case involve the interrelation of state authority to regulate hospital rates and arguably inconsistent federal health planning policy as did *Health Care Plan of New Jersey v. Schweiker,* 553 F.Supp. 440 (D.N.J.1982), *aff'd without opinion,* 707 F.2d 1391 (3d Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983). Rather, both Maryland statutes and regulations indicate an intent to act in accord with federal health planning law. The lack of federal ability to enforce the provisions of that law does not change the intent expressed by the General Assembly in enacting §§ 19–101 to –123 of the Health-General Article. Thus, the Court of Special Appeals did not err in requiring that the grant of Southern's CON comply with federal as well as state law.

## B. *The Commission's Authority*

■ The Commission is entirely a statutory creation; thus, its actions must be sanctioned by the statute creating it. *Holy Cross Hosp. v. Health Services,* 283 Md. 677, 683, 393 A.2d 181 (1978). Regulations lawfully promulgated by the Commission have the same force and effect as the statute authorizing the Commission to act. *Md. Port Adm. v. Brawner Contracting Co.,* 303 Md. 44, 60, 492 A.2d 281 (1985). We agree with the intermediate appellate court that the Commission violated its own regulations and thus exceeded its authority in granting the CON to Southern.

COMAR 10.24.01.06F(1) (1980) required the Commission to do the following before issuing a certificate of need:

"(a) Provide[ ] written documentation as to the:

"(i) Efficiency and appropriateness of the use of existing inpatient facilities providing inpatient services similar to those proposed; and

"(ii) Capital and operating costs (and their potential impact on patient charges), efficiency, and appropriateness of the proposed institutional health service.

"(b) Issue[ ] the following written findings:

"(i) That superior alternatives to these inpatient services in terms of cost, efficiency, and appropriateness do not exist and that the development of alternatives is not practicable;

"(ii) That in the case of new construction, alternatives to new construction (such as modernization or sharing arrangements) have been considered and have been implemented to the maximum extent practicable;

"(iii) That patients will experience serious problems in the terms of cost, availability, or accessibility, or other problems that may be identified by the reviewing HSA, in obtaining inpatient care of the type proposed in the absence of the proposed service; . . . ."

This regulation also required the Commission to provide notice to other agencies within the Department of Health and Mental Hygiene of the issuance of a CON; that notice

had to include a description of the proposed health services, the total costs of the certified project, and the proposed financing mechanism and terms. The CON issued to Southern did not meet these requirements.

Southern's application for a CON was to add 120 beds. The documentation in its application and the evidentiary hearing primarily related to the need for 120 beds. The staff report dealt exclusively with the 120–bed proposal. As the Court of Special Appeals noted, a very limited part of the record dealt with the feasibility of the thirty-seven bed proposal. The Commission's order granted a CON for thirty-seven beds on the condition that the applicant submit the missing information. Thus, the Commission failed to document the need for, and the feasibility and the appropriateness of the modified proposal before certifying its approval of the CON.

The Commission attempts to justify this failure by arguing that it has the authority to approve a CON with conditions. Section 19–118(d)(4) of the Health-General Article does give the Commission this authority. COMAR 10.24.-01.08A (1980), however, required that conditions attached to a CON "relate directly to a [review] criterion or guideline published in the applicable health systems plan ..., the State Health Plan, or these regulations."[4] The regulations listed thirteen criteria to be considered in reviewing a CON application. COMAR 10.24.01.06B(2)(a)–(m) (1980).

■ Conditions two and three meet this definition. They note particular, limited deficiencies in Southern's application and require that it correct these problems in order to comply with specified standards in the HSP or SHP. Condi-

---

4. The Commission also objects to the Court of Special Appeals' interpretation of the word "condition" cited above. We agree that the court did not have to interpret the term "condition" in § 19–118(d)(4) because the Commission regulations define condition with sufficient clarity to eliminate any need for interpretation. *See Comptroller v. Fairchild Industries,* 303 Md. 280, 284, 493 A.2d 341 (1985). The Court of Special Appeals' definition, however, does not affect the outcome of this case.

tions one and four, however, require the applicant to submit the information necessary for the Commission to consider the thirty-seven bed project in relationship to the thirteen criteria in the regulations and the state plan. Thus, they do not directly relate to Southern's compliance with these review criteria as required by COMAR 10.24.01.08A (1980). Without the information required by conditions one and four, the Commission cannot make findings required by its regulations.[5]

## C. *Substantial Evidence*

■ Southern argues that the record contains the information necessary to support the award of a CON for thirty-seven beds. We disagree.

Southern's application attempted to document the need for 120 additional beds in Southern Maryland and described how the hospital planned to use these additional beds. The financial information in the application assumed that the hospital would add 120 beds. Most of the evidence introduced at the four-day hearing in November and December 1983 also related to the 120–bed proposal. Although Southern did provide some information about a possible thirty-seven bed project, it did so under protest. Before responding to the hearing officer's questions, Southern's counsel emphasized for the record that the testimony should not be construed as a modification of the application for 120 additional beds. The applicant's chief executive officer then testified that he had "throw[n] together some figures regarding 37 beds." The three-volume record contains only nineteen pages of testimony about the thirty-seven bed

---

5. We recognize that the Commission has authority to require modifications of CON applications. Such modifications may be accomplished in at least two different ways, within the scope of the Commission's authority. First, the Commission could require an applicant to submit the information for review of a modified project before issuing a CON. *See* COMAR 10.24.01.07A(4). Second, the Commission could approve portions of the applicant's proposal if the application contained the information necessary to support the need for these individual pieces.

alternative and has no details about construction or operating costs, construction plans, or utilization of these beds.

The Commission staff report also focused exclusively on the 120–bed proposal. As the statute and regulations require it to do, the staff analyzed the 120–bed project for consistency with the SMHSP and the SHP. § 19–118(c)(1); COMAR 10.24.01.06B, F (1980). Only in its modification submitted after two days of the hearing did the staff note that a need for thirty-seven beds in Prince George's County had been established. The staff did not conclude, however, that Southern had demonstrated that it should receive a CON for all of these beds.

We thus conclude that the Court of Special Appeals correctly determined that the Commission exceeded its authority in granting a CON to Southern subject to the stated conditions.

JUDGMENT AFFIRMED, WITH COSTS.